UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TISA D. MALONE,

       Plaintiff,                                  CIVIL ACTION NO. 09-13740

       v.                                        DISTRICT JUDGE ARTHUR J. TARNOW

COMMISSIONER OF                       MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I.    PROCEDURAL HISTORY**

    *A.    Proceedings in this Court*

On September 21, 2009, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability/disability insurance and Supplemental Security Income benefits (Dkt. No. 3). This matter is currently before the Court on cross-motions for summary judgment (Dkt. Nos. 11, 14).

    *B.    Administrative Proceedings*

Plaintiff filed the instant claims on January 26, 2005, alleging that she became unable to work on May 10, 2004 (Tr. 53). The claim was initially disapproved by the Commissioner on March 24, 2005 (Tr. 36, 240). Plaintiff requested a hearing and, on June 7, 2007, Plaintiff

appeared with counsel before Administrative Law Judge (ALJ) Joel G. Fina, who considered the case *de novo*. In a decision dated August 7, 2007, the ALJ found that Plaintiff was not disabled (Tr. 13-23). Plaintiff requested a review of this decision on August 13, 2007 (Tr. 10-12). The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-1-2, Tr. 246-263), the Appeals Council, on July 27, 2009, denied Plaintiff's request for review (Tr. 3-5); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**II.     STATEMENT OF FACTS**

   *A.     ALJ Findings*

Plaintiff was 33 years old at the time of the most recent administrative hearing (Tr. 22). Plaintiff has past relevant work history as an assembler and a medical assistant (Tr. 22). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since May 10, 2004 (Tr. 18). At step

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative disc disease, right carpal tunnel syndrome and diabetes mellitus. *Id*. At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 20). Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to:

> [L]ift up to twenty pounds occasionally and ten pounds frequently in light work that allows for a sit/stand option alternating at will. [Plaintiff] cannot climb ladders, ropes or scaffold or crawl. She can frequently climb ramps or stairs. [Plaintiff] can occasionally stoop, crouching and kneel. [Plaintiff] can occasionally handle objects (gross manipulation) with the right hand and occasionally finger (fine manipulation) using the right hand. [Plaintiff] must avoid concentrated exposure to excessive vibration, concentrated use of moving machinery and concentrated exposure to unprotected heights (Tr. 20).

At step four, the ALJ found that Plaintiff could not perform her previous work as an assembler nor as a medical assistant. (Tr. 22) At step five, the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as security guard (4,500 jobs in the region and 555,000 nationally), childcare worker (3,400 jobs in the region and 411,000 nationally) and parking lot attendant (2,200 jobs in the region and 58,000 nationally) (Tr. 23). Thus, the ALJ found that Plaintiff was not disabled.

### B. *Administrative Record*

#### 1. **Plaintiff's Testimony and Statements**

Plaintiff provided information in February 2005 about her ability to perform daily and social activities (Tr. 72-79). When asked which of nineteen activities were affected by her illnesses, Plaintiff identified only her abilities to lift and use her hands (Tr. 77). Specifically, she reported problems combing her hair (Tr. 73). However, she reported that she prepared meals

every day, cleaned, did laundry, ironed and cared for her personal needs (Tr. 73, 74). She further reported that she went outside every day, and that she drove a car (Tr. 75). Plaintiff also provided information about her hobbies, interests, and social activities (Tr. 76). Her hobbies included watching television, baking, and lifting weights, but she reported difficulties engaging in those activities (Tr. 76). She spent three or four hours a month grocery shopping, and visited her family and friends daily (Tr. 75-76). She also went to church and to her daughter's school (Tr. 76).

Plaintiff also provided detailed information about her activities during three days in July 2005 and three days in May 2007 (Tr. 87-91, 102-05). During these time-frames, Plaintiff reported that she spent several hours cooking, cleaning, washing clothes, going to the gym, taking her daughter to the pool, attending church, grocery shopping, and going to Wal-Mart (Tr. 87-91, 102-05). She also watered plants, got gas for her car and paid bills (Tr. 89, 103).

Plaintiff's attorney stated, at the start of the hearing that Plaintiff could not work because she had problems with her back and right hand (Tr. 267). Plaintiff testified that the pain caused her to have difficulties caring for her personal needs, but that she drove three or four times a day, cooked, vacuumed, made her bed, folded clothes, grocery shopped with her daughter and cleaned the restroom, performing these activities at a slow pace (Tr. 275-78). She claimed that she had difficulties sitting for extended periods of time, but she climbed stairs and exercised an hour to an hour and a half (Tr. 281, 287-88).

## 2.     Medical Evidence

In December 2002, prior to her alleged onset of disability, Plaintiff had surgery for carpal tunnel on her right hand (Tr. 210). About three weeks later, Dr. Dong Wha Ohm, M.D., noted that Plaintiff's symptoms had improved since the surgery, and that she was now doing active exercises (Tr. 210). He estimated her recovery time to be about four to six weeks (Tr. 210). Several months later, in August 2003, Plaintiff's primary care physician, Dr. Samuel Dismond, M.D., referred her to Dr. M.N. Sabbagh, M.D., for reported headaches (Tr. 115-16).

Dr. Sabbagh's assessment was that Plaintiff's headaches were related to migraines (Tr. 116). She prescribed medication, and advised Plaintiff to lose weight (Tr. 116). The following month, Plaintiff had a follow-up appointment (Tr. 114). Dr. Sabbagh noted that the abnormal findings on an MRI of the brain were quite mild and non-specific (Tr. 114). Therefore, she advised Plaintiff to continue taking the medications, and suggested that she return for a follow-up in two months (Tr. 114). Three months later, Plaintiff reported that the medications were working and that she felt better (Tr. 113). Therefore, Dr. Sabbagh advised that she stay on the medications, and noted that she would re-evaluate her in six months (Tr. 113).

Two months later, in February 2004, Plaintiff saw Dr. Saeed, apparently an associate of Dr. Dismond, complaining that she had a migraine headache and pain in her right hand (Tr. 139). She admitted that she had not been using her wrist support (Tr.139). Dr. Saeed examined Plaintiff's hand (Tr. 139). He noted that there was no swelling and that her handgrip was within normal limits (Tr. 139). Therefore, he continued her on medication, and advised her to use her wrist support (Tr. 139).

In May 2004, Plaintiff returned to Dr. Sabbagh for a neurological follow-up appointment (Tr. 111). Dr. Sabbagh noted that Plaintiff was responding well to the medication (Tr. 111). Plaintiff, however, reported that it made her feel funny (Tr. 111). Dr. Sabbagh noted that Plaintiff's migraines were controlled and that she appeared to be doing well (Tr. 111). Therefore, she advised her to follow-up in six months (Tr. 111).

In August 2004, Plaintiff returned to Dr. Sabbagh (Tr. 109). Plaintiff reported that she was having carpal tunnel syndrome symptoms (Tr. 109). Dr. Sabbagh noted that her Tinel's sign test was positive, and that an EMG (electromyography) of the right upper extremity showed mild to moderate carpal tunnel syndrome (Tr. 109). She suggested conservative treatment, rather than surgical intervention (Tr. 109). She prescribed medication, and advised Plaintiff to wear a wrist splint at night and use an elbow pad (Tr. 109).

Later that month, Plaintiff went back to Dr. Dismond, complaining of pain in her elbow, wrist and knee (Tr. 136). Dr. Dismond noted that the examination of Plaintiff's right knee was completely negative, that she did not have any swelling, and that her range of motion was good (Tr. 136). A week later, Plaintiff had a follow-up with her carpal tunnel surgeon, Dr. Ohm (Tr. 119). He noted there was no clinical evidence of recurrent carpal tunnel syndrome (Tr. 119).

Over the next several months, Plaintiff continued to report that she was experiencing pain (Tr. 133-35). Dr. Dismond ordered an EMG of her right leg and an MRI of her lumbar spine, and advised her to try water exercises (Tr. 134). However, at a follow-up visit she admitted that she had not tried the exercises (Tr. 135). The EMG showed a moderate degree of radiculopathy (nerve root disease) (Tr. 120-21) but the MRI reflected no abnormalities (Tr. 142). Dr. Dismond advised Plaintiff to participate in physical therapy (Tr. 133).

In February 2005, after slipping on ice, Plaintiff returned to Dr. Saeed (Tr. 131). Plaintiff reported that she had pain in her left arm (Tr. 131). However, the examination showed that there was no swelling and full range of motion (Tr. 131). Dr. Saeed recommended medication as needed (Tr. 131).

Over the next year, Plaintiff had surgery on her foot and had a benign nodule removed from her thyroid (Tr. 157, 168). Dr. Dismond noted that she was breathing better after her thyroid surgery, and Plaintiff reported that she was getting good results from her foot surgery (Tr. 168).

In September 2005, Plaintiff saw Dr. Sabbagh for a follow-up appointment (Tr. 153). Dr. Sabbagh noted that her headaches were under control and advised Plaintiff to return for a reevaluation in six months (Tr. 153). In February 2006, Plaintiff went back to Dr. Saeed complaining that she had pain in her right wrist (Tr. 167). He prescribed a wrist support (Tr. 167). Two months later, in April 2006, she returned for a follow-up appointment and told Dr. Dismond that she was exercising regularly, walking about three miles a day, and doing 100 sit-ups three times a week (Tr. 166). He advised her to return for a follow up in three months (Tr. 166). The following month, she went to Dr. Dismond complaining of pain associated with carpal tunnel syndrome (Tr. 165). She said the pain was intense, but an examination of the right wrist and hand were unremarkable (Tr. 165).

In May 2006, Dr. Thomas Beird, M.D., wrote a letter to Plaintiff's attorney about her current condition (Tr. 159-60). He opined that Plaintiff would require permanent restrictions on or off the job to prevent further aggravation of her carpal tunnel syndrome (Tr. 160). He specifically noted that she should avoid the use of vibratory power tools and repetition and

intensive activities with her right hand (Tr. 160). He further noted that she should wear a splint on her right hand when performing any job related activities (Tr. 160).

At a follow-up appointment, in October, Plaintiff reported to Dr. Dismond that she was having problems with her lower back and left hip (Tr. 161). Plaintiff said the pain was aggravated by driving (Tr. 161). Dr. Dismond noted that she had pain on extreme right straight leg raising, but her back revealed no spasm or tenderness, and she had good range of motion in her legs (Tr. 161). He advised her to lose weight and to return in a month, for a follow-up (Tr. 161). The following month, Karen Smith, Plaintiff's physical therapist, provided an update on her hand condition (Tr. 203). Ms. Smith noted that Plaintiff reported that there was no improvement in her pain level or her ability to perform activities of daily living (Tr. 203). She also noted that Plaintiff's prehension grasping had decreased (Tr. 203). However, Ms. Smith noted that there was an improvement in the range of motion in her wrist, her grip strength, her fine motor coordination, and the edema in her right hand (Tr. 203).

In May 2007, Dr. Sabbagh completed a medical source statement (Tr. 236). She opined that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand, walk and sit about six hours each in an eight-hour work day, and had a mild limitation on pushing and pulling with her right upper extremity (Tr. 236). She further opined that Plaintiff should avoid hammering and use of power tools with her right hand (Tr. 236).

Seven months later, in January 2008, Plaintiff returned to Dr. Dismond, complaining that she was experiencing pain and numbness in her right hand (Tr. 260). Dr. Dismond noted that the examination of her right hand and wrist were unremarkable (Tr. 260). As a result, he advised her to continue on medications and follow up in one month (Tr. 260). Two months later, Plaintiff

had an MRI of the lumbar spine (Tr. 252). There was slight hypertrophy, but no focal herniation (Tr. 252). Overall, it was similar to the November 2004 MRI (Tr. 252). In April 2008, Plaintiff complained that it felt as if someone were sticking her with pins in her left leg, but Dr. Dismond stated that her sensation seemed good on examination (Tr. 262).

### 3. Vocational Expert

Ann Tremblay testified during the hearing as an impartial vocational expert (VE) (Tr. 297). Ms. Tremblay classified Plaintiff's past work as an assembler as light and unskilled, and her work as a medical assistant as light to medium and skilled (Tr. 298). The ALJ asked Ms. Tremblay to consider a hypothetical person the same age as Plaintiff, with the same education and work experience, who was limited to lifting up to 20 pounds occasionally and lifting or carrying up to 10 pounds frequently; who could not climb ladders, ropes, or scaffolds; who could frequently climb ramps and stairs; and who could occasionally stoop, crouch and kneel, but never crawl (Tr. 299). Ms. Tremblay said an individual with the specified characteristics could perform both of Plaintiff's past jobs (Tr. 299).

The ALJ then modified the hypothetical to specify that the individual could frequently handle objects with the right upper extremity with no limitation on the left upper extremity; could frequently finger with the right upper extremity with no limitation on the left upper extremity; and needed to avoid concentrated exposure to moving machinery, unprotected heights, and excessive vibration (Tr. 299). Ms. Tremblay testified that the individual would be able to perform Plaintiff's past assembly position (Tr. 300).

The ALJ further modified the hypothetical to specify that the individual that would also be limited to positions that allowed her to sit or stand at will (Tr. 300). Ms. Tremblay testified

that the individual would not be able to perform Plaintiff's past work, but could perform other light unskilled jobs that exist in the national economy such as inspector, assembler or security guard (Tr. 300).

The ALJ then modified the hypothetical to include a limitation to occasional, rather than frequent, fingering and handling with the right upper extremity (Tr. 301). Ms. Tremblay testified that the individual would still be able to perform various light jobs such as security guard, child care worker or parking lot attendant (Tr. 301).

The ALJ modified the hypothetical again to provide that the individual would exceed normal breaks and could not engage in sustained work activity on a regular basis for eight hours a day and five days a week (Tr. 301). Ms. Tremblay testified that those limitations would be inconsistent with full-time competitive work (Tr. 301). She testified that her testimony was consistent with the Dictionary of Occupational Titles (Tr. 302).

### C. *Plaintiff's Claims of Error*

Plaintiff's only argument on appeal is that the ALJ erred by failing to properly evaluate Dr. Sabbagh's medical opinion (Pl. Br. 9). Specifically, Plaintiff avers that, while the ALJ's opinion did mention the medical source statement filled out by Dr. Sabbagh, the ALJ did not adequately discuss nor analyze the opinion of Dr. Sabbagh.

## III. DISCUSSION

### A. *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*,

493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a

certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d

528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B. *Governing Law*

The "[c]laimant bears the burden of proving her entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant

numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C. *Analysis and Conclusions*

As noted earlier, Plaintiff's only argument on appeal is that the ALJ erred by failing to properly evaluate Dr. Sabbagh's medical opinion (Pl. Br. 9). Defendant responds that the ALJ not only considered Dr. Sabbagh's opinion (Tr. 19), but that the ALJ's findings are almost completely consistent with Dr. Sabbagh's opinion (Def. Br. 10-12). Defendant's argument is well-taken.

Dr. Sabbagh opined that Plaintiff could occasionally lift/carry up to 20 pounds, and frequently lift/carry up to 10 pounds; stand/walk and sit with normal breaks up to 6 hours a day; had mild upper extremity limitations on pushing and pulling with her upper right extremity, including the operation of hand and foot controls; should avoid hammering and the use of power tools with her right hand; and would miss work one to two hours per month (Tr. 236). The ALJ found that Plaintiff had to avoid concentrated exposure to excessive vibration and concentrated use of moving machinery, which accounted for Dr. Sabbagh's specific limitation to avoid the use of power tools (Tr. 20, 236). Dr. Sabbagh also found that Plaintiff needed to avoid the use of hammering (Tr. 236). None of the jobs the ALJ found Plaintiff could perform (*i.e.*, security guard, child care worker, and parking lot attendant) require hammering (Tr. 23) or similar motions. Dr. Sabbagh also noted that Plaintiff's limitations would cause her to miss 1 to 2 hours of work a month (Tr. 236). The VE testified that generally the maximum allowable absences was one day per month (Tr. 302). As such, it was reasonable for the ALJ to find that Plaintiff

could perform the jobs identified by the VE, notwithstanding Plaintiff's impairments (Tr. 23). The ALJ properly accounted for all of Dr. Sabbagh's limitations when arriving at Plaintiff's RFC.

Indeed, the ALJ's findings as to Plaintiff residual functional capacity (RFC) actually included many greater restrictions than those reflected in Dr. Sabbagh's opinion – unlike Dr. Sabbagh, the ALJ also found that Plaintiff could not climb ladders, ropes, scaffolds, or crawl; could only stoop, crouch, and kneel occasionally; must avoid moving machinery, and unprotected heights; and needed a sit-stand option (Tr. 19, 20).

Plaintiff does not argue that the ALJ erred in adopting Dr. Sabbagh's opinion. Rather, Plaintiff argues that the ALJ failed to comply with the Agency's regulations, because he did not provide good reasons for rejecting it (Pl. Br. 8). The premise of Plaintiff's argument is wrong. In *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004), the Sixth Circuit held that "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." Since, the ALJ's decision is consistent with Dr. Sabbagh's opinion, the absence of a specific discussion about how much weight the ALJ gave the opinion is simply not reversible error.

Furthermore, the ALJ was entitled to rely on Dr. Sabbagh's opinion because it was consistent with the medical evidence and did not conflict with any other opinions of record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (treating physician's medical opinion entitled to controlling weight if supported by medical evidence and not inconsistent with other substantial evidence); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing regulation).

In sum, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.     RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

                                                       S/Mark A. Randon
                                                       MARK A. RANDON
                                                       UNITED STATES MAGISTRATE JUDGE

Dated: September 20, 2010

Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, September 20, 2010, by electronic and/or ordinary mail.

                                                       S/Barbara M. Radke
                                                       Judicial Assistant